The KROGER CO., et al., Plaintiffs,

v.

SANOFI–AVENTIS, et al., Defendants.

In re Plavix Direct Purchaser Antitrust Litigation.

This Document Relates to All Actions.

CVS Pharmacy, Inc., et al., Plaintiffs,

v.

Sanofi–Aventis, et al., Defendants.

Nos. 1:06–CV–163, 1:06–CV–202, 1:06–CV–427.

United States District Court, S.D. Ohio, Western Division.

March 26, 2010.

Gregory Alan Harrison, Dinsmore & Shohl, Jean M. Geoppinger, Waite Schneider Bayless & Chesley Co LPA, William Henry Blessing, Cincinnati, OH, Richard Alan Arnold, Scott E. Perwin, Kenny Nachwalter PA, Miami, FL, for Plaintiffs.

Gregory Alan Harrison, Dinsmore & Shohl, Joseph P. Thomas, Jeffrey Francis Peck, Ulmer & Berne, Cincinnati, OH, Richard J. Stark, David Greenwald, Evan R. Chesler, Cravath, Swaine & Moore LLP, New York City, NY, Alan R. Dial, Kevin R. Sullivan, Peter M. Todaro, King & Spalding LLP, Washington, DC, for Defendants.

---

## OPINION AND ORDER

MICHAEL H. WATSON, District Judge.

### I. INTRODUCTION

This matter arises from actions against Defendant pharmaceutical manufacturers, Sanofi Aventis and Sanofi–Synthelabo, Inc. ("Sanofi Aventis") and Bristol–Myers Squibb Company and Bristol–Myers Squibb Sanofi Pharmaceuticals Holding Partnership ("BMS") (collectively "Sanofi") and Apotex Corporation ("Apotex") (collectively "Defendants"). These cases involve Plavix, a pioneer clopidogrel bisulfate drug used to treat patients at risk for heart attacks and strokes. Sanofi manufacturers Plavix. Apotex was the first generic applicant to seek Federal Drug Administration ("FDA") approval to market a generic version of Plavix in the United States.

Plaintiffs have brought antitrust claims for alleged violations under §§ 1 and 2[1] of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs claim that they have suffered antitrust injuries as a result of Defendants' alleged illegal agreements. Plaintiffs assert the alleged illegal agreements prevented Defendants from entering into a legal competitive agreement which would have permitted the generic version of Plavix to enter the market at an earlier date thus allowing Plaintiffs to purchase the drug for a lower price.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). Venue is proper in this Court pursuant to 15 U.S.C. § 22 because each Defendant transacts business here.

Defendants Sanofi and Apotex have moved the Court to dismiss Plaintiffs' claims, pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs have responded to the motions, and Defendants have replied. For the reasons that appear below, the Court **GRANTS** Defendants' motions to dismiss (Case No. 1:06–CV–163 Docs. 67 & 68; Case No. 1:06–CV–202 Docs. 97 & 98; Case No. 1:06–CV–427 Docs. 60 & 61).

### II. BACKGROUND

#### A. The Parties

##### 1. Defendants

###### (a) The Sanofi Defendants

Defendant Sanofi–Aventis is a French corporation engaging in the development,

---

[1]. Section 2 claims are not brought against Defendant Apotex. See, e.g., Second Am. Compl. at ¶ 132 (Case No. 1:06–cv–163, Doc. 62).

manufacture, and sales of brand-name pharmaceutical drugs throughout the United States. Defendant Sanofi–Synthelabo is a Delaware corporation and an affiliate of Sanofi–Aventis. Defendant Sanofi–Synthelabo is the holder of the U.S. patent 4,847,265 ("the '265 patent") for Plavix, the pharmaceutical drug at issue in this litigation.

Defendant Bristol–Myers Squibb is a Delaware corporation engaging in the development, manufacturing, and selling of brand-name pharmaceutical drugs throughout the United States. Defendant Bristol–Myers Squibb Sanofi Pharmaceuticals Holding Partnership is a partnership registered in the state of Delaware. Under this business arrangement with Sanofi–Aventis, Bristol–Myers Squibb and Bristol–Myers Squibb Sanofi Pharmaceuticals Holding Partnership engage in the marketing and selling of Plavix throughout the United States.

#### (b) The Apotex Defendant

Defendant Apotex is a Delaware corporation and is a wholly-owned subsidiary of Apotex, Inc., Canada's largest generic drug manufacturer. Apotex was the first

2. The Kroger Plaintiffs: The Kroger Co., Walgreen Co., Eckerd Corporation, Maxi Drug, Inc. d/b/a Brooks Pharmacy, Albertson's, Inc., Safeway, Inc., Hy–Vee, Inc. and American Sales Company, Inc.

3. The Direct Purchaser Class Plaintiffs: Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc., SAJ Distributors, Inc., Stephen L. LaFrance Holdings, Inc. on behalf of themselves and a proposed class of direct purchasers of Plavix

4. CVS Pharmacy, Inc., et al.: CVS Pharmacy, Inc., Rite Aid Corporation, and Rite Aid Hdqrts. Corp.

5. Except for American Sales Company, Inc. American Sales Company, Inc. purchases pharmaceutical goods and distributes such goods to retail stores owned by affiliated companies.

generic applicant to seek FDA approval to sell generic Plavix.

#### 2. Plaintiffs

##### (a) Direct Purchasers

The Direct Purchasers consist of the Kroger Plaintiffs,[2] The Direct Purchaser Class Plaintiffs,[3] and the CVS Plaintiffs.[4] The Direct Purchasers purchase pharmaceutical products for distribution and sale throughout several states. The Direct Purchasers own and operate retail stores with pharmacies throughout several states[5] and these pharmacies dispense pharmaceutical drugs, including Plavix, to the public.[6]

##### (b) Indirect Purchasers

The Indirect Purchasers[7] consist of end-payors who seek to represent in this class action "[a]ll persons and entities throughout the United States and its territories who purchased Plavix for themselves, their families, or their members, employees, insureds, participants, or beneficiaries" during the relevant time period. End–Payor Pls.' First Am. Consol. Class Action Compl. ¶ 148 (Case No. 1:06–cv–226, Doc.

6. The Direct Purchasers have each filed a separate complaint. The Direct Purchasers have collectively responded to Defendants' motion to dismiss.

7. Indirect Purchasers: American Federation of State, County and Municipal Employees District Council 47 Health and Welfare Fund, Kenneth A. Franklin, International Association of Fire Fighters Local 22 Health and Welfare Fund, International Brotherhood of Electrical Workers Local 98 Health & Welfare Plan, Painters District Council No. 30 Health and Welfare Fund, Richard Parker, Plumbers and Pipefitters Local Union 630 Welfare Fund, Joel Scheckner, United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund, United Food and Commercial Workers Union Local 1776 and Participating Employers Health and Welfare Fund, Vista Healthplan, Inc., Charles S. Watson, and Antonette Williams.

81). The Indirect Purchasers consist of individual consumers, health and benefit funds, and private insurance companies that are third-party payors. Such third-party payors pay some or all of the cost of prescription drugs, specifically Plavix, purchased for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

## B. Regulatory System Governing the Drug Approval Process

Before a drug can be sold in the United States, the FDA must approve the drug. 21 U.S.C. § 355(a). A pioneer drug manufacturer files a new drug application ("NDA") with the FDA as part of the process of proving the drug is safe and effective, and to obtain premarket approval. The NDA must reference those patents that claim the new drug and for which a claim of patent infringement could reasonably be asserted against an unauthorized manufacturer or seller. After the FDA approves the NDA, the NDA and its related patents are listed in the Approved Drug Products With Therapeutic Equivalence Evaluations publication, also known as the "Orange Book."

The Hatch–Waxman Act of 1984 ("Hatch–Waxman Act") regulates the approval of generic pharmaceutical drugs through an expedited FDA approval process. 21 U.S.C. § 355. This expedited process allows generic versions of brand-name drugs previously approved by the FDA to reach market more quickly by allowing the generic manufacturer to forego clinical trials in reliance on the test results of the brand name manufacturer.

A generic drug company files an Abbreviated New Drug Application ("ANDA") if it seeks to utilize the expedited approval process. The ANDA Application must include a statement certifying that the generic drug will not infringe on the brand name manufacturer's drug.[8] See 21 U.S.C. § 355(j)(2)(A)(vii)(I–IV). A Paragraph IV certification triggers a 45–day time frame in which the NDA holder can file an action against the generic manufacturer for infringement of the patent which is the subject of the certification. 21 U.S.C. § 355(j)(5)(B)(iii). Pursuant to statute, upon filing such a suit, the FDA's approval of the ANDA is automatically stayed for up to 30 months, until the expiration of the pioneer patent, or until judicial resolution of the patent litigation. 21 U.S.C. § 355(j)(5)(B)(iii)(I–III).

The FDA grants the first generic manufacturer to file a Paragraph IV certification with an ANDA for a specific drug an 180–day exclusivity period to sell its version of the generic drug without other generic competitors entering the market. The 180–day exclusivity period begins to run from (1) the day the court determines the pioneer drug's patent is invalid, or (2) the day the initial holder of the ANDA application first markets the generic. 21 U.S.C. § 355(j)(5)(B)(iv)(I), (II). During the 180–day exclusivity period other generic manufacturers are prevented from receiving ANDA approval.

Much controversy surrounds the potential for companies to collude to subvert the Hatch–Waxman Act during this 180–day exclusivity period. If a brand name manufacturer pays a generic manufacturer to stay off the market, the 180–day period is

---

**8.** Four types of certifications exist:

(1) "Paragraph I" certification: no patent information has been filed with the FDA;
(2) "Paragraph II" certification: the patent has expired;

(3) "Paragraph III" certification: the date the patent will expire in the future, or;
(4) "Paragraph IV" certification: the patent is invalid or not infringed by the generic product,

See 21 U.S.C. § 355(j)(2)(A)(vii)(I–IV).

not triggered and thus the time never begins to run. Therefore, neither the generic manufacturer paid by the patent holder nor other generic manufacturers waiting in line for the 180–day period to run can enter the market. Such so-called "reverse payment" agreements have been heavily scrutinized for being anti-competitive. Furthermore, when settlement agreements end the patent litigation initiated by the filing of the ANDA with Paragraph IV certification, the patent's validity is never litigated. *See, e.g.,* Alan Devlin, *Exclusionary Strategies in the Hatch–Waxman Context,* 2007 MICH. ST. L.REV. 631 (2007); James C. Burling, *Hatch–Waxman Settlements: The Battle for a Benchmark,* 20–SPG ANTITRUST 41 (2006); Herbert Hovenkamp, Mark Janis & Mark A. Lemley, *Anticompetitive Settlement of Intellectual Property Disputes,* 87 MINN. L.REV. 1719 (2003).

## C. Sanofi's Patents and Product

Sanofi is the patent assignee of several patents, including: U.S. patent 4,529,596 issued July 16, 1985, and U.S. patent 4,847,265 ("the '265 patent") issued July 11, 1989, and Canadian patent 1,194,875 issued on or about October 15, 1985. Sanofi submitted the NDA for Plavix on April 28, 1997, and it was approved by the FDA on November 17,1997. Plavix is listed in the Orange Book as covered by the '265 patent, U.S. Patent 5,576,328 ("the '328 patent"), U.S. Patent 6,429,210 ("the '210 patent"), and U.S. Patent 6,504,030 ("the '030 patent"). Sanofi and BMS under a business partnership jointly market the pharmaceutical drug Plavix in the United States.

Plaintiffs' complaints allege the '265 patent is invalid because of misrepresentations and omissions made to the Patent and Trademark Office ("PTO") as part of the patent application, resulting in inequitable conduct by Sanofi, thereby rendering the '265 patent unenforceable. The Court

takes judicial notice of United States District Judge Sidney Stein's decision, *Sanofi–Synthelabo v. Apotex Inc.,* 492 F.Supp.2d 353, 397 (S.D.N.Y.2007), *aff'd,* 550 F.3d 1075 (Fed.Cir.2008), *cert denied,* —— U.S. ——, 130 S.Ct. 493, 175 L.Ed.2d 346 (2009), finding no clear and convincing evidence that Sanofi engaged in inequitable conduct before the PTO regarding the '265 patent valid, finding the '265 patent valid and enforceable, and issuing a permanent injunction barring Apotex from engaging in any activity that infringes the '265 patent. *See Buck v. Thomas M. Cooley Law Sch.,* 597 F.3d 812, 816 (6th Cir.2010) ("Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment." (citing *Winget v. JP Morgan Chase Bank, N.A.,* 537 F.3d 565, 576 (6th Cir.2008))).

## D. Apotex's ANDA and the Patent Litigation

On November 16, 2001, Apotex became the first manufacturer to seek FDA approval to market a generic version of Plavix in the United States. Apotex filed an ANDA with a Paragraph IV certification to sell a generic version of Plavix and gave notice to Sanofi of such Paragraph IV certification. Apotex claimed that each patent listed in the Orange Book that related to Plavix was unenforceable, invalid, and would not be infringed by Apotex's generic drug. Pursuant to the Hatch–Waxman Act, Apotex, as the first generic manufacturer to file an ANDA with Paragraph IV certification, was entitled to the 180–day exclusivity period once it began marketing its generic version of Plavix.

Following this ANDA filing by Apotex, Sanofi filed a lawsuit on March 21, 2002, in the United States District Court for the

Southern District of New York asserting Apotex had infringed on two of the patents covering Plavix, the '265 patent and the '328 patent, pursuant to 35 U.S.C. § 271(e)(2)(A).[9] Thus the lawsuit triggered a 30–month delay during which the FDA could not approve Apotex's ANDA. Subsequently, Sanofi dismissed with prejudice its claims based on the '328 patent; therefore only the claims for infringement of the '265 patent remained.

In addition to its suit against Apotex, Sanofi also filed suit against Dr. Reddy's Laboratory, Ltd., Dr. Reddy's Laboratories, Inc., and Teva Pharmaceutical Industries, Ltd., for alleged infringement of the '265 patent through their potential selling of generic Plavix.

### E. Agreements between Sanofi and Apotex

Apotex received final FDA approval for its generic version of Plavix on January 20, 2006; the automatic 30–month stay expired in May 2005. The patent trial was scheduled for April 2006. Because of the gap in time until trial, Apotex was faced with launching its generic drug "at-risk" (i.e., without resolution of the patent's validity). A launch at-risk exposed Apotex to the danger that Sanofi would file for a preliminary injunction enjoining Apotex from selling generic Plavix while the lucrative 180–day exclusivity period continued to run, and subjected Apotex to possible infringement damages if the patent was upheld.

Apotex began planning for a launch at-risk. It entered into purchase contracts for raw materials in anticipation of the launch of generic Plavix and also began obtaining pre-release orders from customers, including many Plaintiffs in this case.

Apotex offered to indemnify its customers from any potential liability they might face as a result of selling generic Plavix. Apotex's Chief Executive Officer, Dr. Bernard Sherman, also issued a press release after Apotex received final FDA approval of its generic Plavix stating that Apotex was confident the '265 patent would be held invalid.

Outside the two companies, independent professionals in the patent field also believed the validity of the '265 patent was questionable. For instance, when Aventis was subject to a hostile bid from Sanofi, Aventis hired Jeffrey Lewis, a patent attorney from Patterson, Belknap, Webb & Tyler LLP, in New York, to review the information surrounding the '265 patent litigation and to advise Aventis shareholders on the risk of the Plavix litigation. In March 2004, Mr. Lewis represented to shareholders and analysts that he believed the challenge to the '265 patent to be very valid. *See* Second Am. Compl. (Case No. 1:06–cv–163, Doc. 62) at ¶ 75.

In addition to the risk of the invalidity of the '265 patent, Plaintiffs in this case allege Sanofi was concerned that even if Sanofi ultimately did prevail on the patent suit, Sanofi risked billions of dollars in lost profits, long term damage to their business prospects, and lowering of their stock price, compounded by the danger that Apotex might not have the resources to pay substantial infringement damages. Thus, Plaintiffs maintain both Sanofi and Apotex were motivated to enter into a settlement agreement by risk and uncertainty. Prior to any negotiation of an agreement, Apotex and Sanofi agreed that Sanofi would not seek a temporary restraining order or a preliminary injunction

---

**9.** In this case, Plaintiffs assert that because of its alleged omission and misrepresentations to the PTO, Sanofi had reason to believe that the '265 patent was invalid as anticipated by prior art under 35 U.S.C. § 102, for obviousness under 35 U.S.C. § 103, and under the doctrine of obviousness-type double patenting.

and Apotex would be protected in selling its generic Plavix for at least 75 days before any patent trial.

### 1. The March Agreement

Sanofi and Apotex began to negotiate a settlement agreement between the parties. On March 21, 2006, Sanofi and Apotex announced a tentative agreement ("the March Agreement") which required approval by the Federal Trade Commission ("FTC") and a consortium of state attorneys general. The alleged terms of the agreement were: (1) Sanofi would not launch an authorized generic of its own during the 180–day exclusivity period; (2) Sanofi would pay Apotex for the cost of its generic Plavix inventory, up to $40 million; (3) Sanofi would pay Apotex $60 million if the FTC and the state attorneys general did not approve the agreement on or before June 30, 2006; if the agreement was approved by that date, Sanofi had the option of paying Apotex $20 million, $30 million, or $40 million per month (depending on the month) through December 31, 2006; (4) Sanofi would make similar payments to Apotex in the event that Sanofi was unable to negotiate an agreement with Dr. Reddy's by the time regulatory approval was obtained; and (5) Sanofi would compensate Apotex in the event that Plavix sales fell below certain specified amounts once Apotex entered the market with its generic version.[10]

The March Agreement was submitted to the FTC and the state attorneys general on March 30, 2006. Sanofi and Apotex issued press releases regarding the March Agreement to settle the '265 litigation, but noted a significant risk existed that the settlement would not be approved by the FTC and the state attorneys general and thus would not be finalized.

On May 5, 2006, the state attorneys general notified Sanofi and Apotex that the March Agreement failed to obtain approval.

### 2. The May Agreement

Sanofi and Apotex submitted a second agreement ("the May Agreement") to the FTC and state attorneys general on May 26, 2006. Thé May Agreement also required approval by the Federal Trade Commission and a consortium of state attorneys general. The May Agreement contained the following modifications to the March Agreement: (1) the effective date of Apotex's license was moved forward to June 1, 2011 from September 17, 2011; (2) if the patent litigation resulted in a judgment that the '265 patent was valid, damages borne by Apotex would be capped at 50% of its net sales (the March Agreement had capped the damages at 70% of sales) and Sanofi would not be entitled to seek attorneys' fees; and (3) Sanofi would not be prohibited from launching its own authorized generic during Apotex's 180–day exclusivity period. On July 28, 2006, the state attorneys general notified Sanofi and Apotex that the May Agreement would not be approved.

Plaintiffs in this case allege the existence of additional verbal side agreements to the May Agreement that were not disclosed to the FTC or the state attorneys general. On July 27, 2006, one day prior to the announcement that the May Agreement was not approved, the Antitrust Division of the Department of Justice launched a criminal probe into the proposed settlement. The offices of BMS' (former) Chief Executive Officer and the Senior Vice President for Strategy and External Affairs were searched by the Federal Bureau of Investigation. On June 11, 2007, BMS entered a plea agreement wherein it pleaded guilty to two counts of making false

---

**10.** The facts of the March Agreement are alleged in each of Plaintiffs' complaints.

statements to government officials in connection with the proposed settlement.

### 3. The Generic Launch by Apotex

On August 8, 2006, Apotex initiated a launch at-risk of its generic version of Plavix. Five days later Sanofi filed a motion for preliminary injunction which was granted on August 31, 2006. Apotex halted sales on its generic 23 days after it launched.

### F. Plaintiffs' Allegations in the Antitrust Litigation

Plaintiffs filed various amended complaints against Defendants alleging violations of antitrust laws. The Direct Purchaser Plaintiffs assert two causes of action, violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

The thrust of Plaintiffs' allegations is that but for Defendants entering into the March and May Agreements described above, Defendants would have instead entered into an agreement with more favorable terms than the March and May Agreements. Plaintiffs claim Defendants would have either (1) entered into a licensing agreement granting Apotex a license to market its generic version of Plavix for a continuous and sustained period before the 2011 patent expiration date; or, alternatively (2) Sanofi would have given up some of its patent life in exchange for delayed entry of Apotex's generic after Apotex received FDA approval. Plaintiffs allege this alternative, allegedly procompetitive agreement would have avoided the '265 patent trial and would have allowed Plaintiffs to receive the benefits of generic competition through cost savings.

### G. *Cardizem*

The seminal case in the Sixth Circuit involving reverse payment agreements between a brand manufacturer and a pharmaceutical generic is the *Cardizem* case.

*In re: Cardizem CD Antitrust Litig.,* 332 F.3d 896, 906 (6th Cir.2003). In *Cardizem,* direct and indirect purchasers of diltiazem hydrochloride, a heart medication commonly referred to as Cardizem CD, sued the manufacturer of the drug and the potential manufacturer of the generic version of the drug for an alleged antitrust violation arising from an agreement entered into by the defendants. Essentially, the agreement provided that the brand name manufacturer, Hoescht Marion Roussell, Inc., would pay Andrx, the generic manufacturer, quarterly payments of $10 million in return for Andrx not marketing its FDA-approved generic. The Sixth Circuit held that such a settlement agreement was per se illegal. *Id.*

The *Cardizem* case occurred under the statutory framework established by the Hatch–Waxman Act. Hoescht held a patent for a time-released version of Cardizem CD that was listed in the Orange Book. Andrx filed an ANDA with a Paragraph IV certification asserting its generic did not infringe on any of Hoescht's patents. Because Andrx was the first to file an ANDA, upon FDA approval it was entitled to the 180–day exclusivity period. In January 1996, Hoescht immediately filed a lawsuit asserting that the generic version infringed its patent, thus triggering the 30–month stay of approval.

Over a year later on September 15, 1997, Andrx obtained tentative approval of its ANDA, and asserted that it would market its generic as soon as either the 30–month stay expired in July 1998 or the court in the patent infringement suit determined Hoescht's patent was not infringed.

Soon thereafter on September 24, 1997, however, and prior to the possible entry date for the generic, Hoescht and Andrx entered into an agreement. The interim settlement agreement provided that Andrx would not market its generic version of the

drug until the patent litigation was decided and would not relinquish its 180–day period of exclusivity. In return, Hoescht would make payments of $40 million per year beginning on the date Andrx received final FDA approval. Essentially, in return for Andrx parking its 180–day period of exclusivity and thereby preventing competition to Hoescht by other generics, Hoescht would make substantial reverse payments to Andrx. Significantly, the agreement extended to other drugs not included in the patent litigation.

The 30–month statutory stay expired on July 8, 1998; pursuant to the agreement, Andrx did not bring its generic drug to market and Hoescht began making $10 million quarterly payments.

The plaintiffs in *Cardizem* filed claims under Section 1 of the Sherman Act seeking treble damages under Section 4 of the Clayton Act. Specifically, the plaintiffs alleged that the agreement and payments caused Andrx not to bring its generic to market and that competition was not introduced to Hoescht's brand name drug thereby keeping the price for *Cardizem* elevated. The plaintiffs asserted the agreement precluded other generics from entering the market because Andrx parked its 180–day exclusivity period.

In several motions to dismiss, the defendants argued, *inter alia,* that the plaintiffs had failed to allege a cognizable antitrust injury. The district court denied each motion to dismiss, concluding the plaintiffs had adequately asserted an "antitrust injury."

Subsequently, the plaintiffs moved for partial summary judgment on the grounds that the agreement was a *per se* illegal restraint of trade. The district court granted the plaintiffs' motion, holding that the agreement, and specifically the payments not to enter the market, was a naked, horizontal restraint of trade and thus was per se illegal.

On interlocutory appeal, the district court certified two questions for the Sixth Circuit Court of Appeals:

(1) ... In determining whether Plaintiffs have properly pled antitrust injury, does the language of the Sixth Circuit's decisions in *Valley Products Co. v. Landmark,* 128 F.3d 398, 404 (6th Cir. 1997) and *Hodges v. WSM, Inc.,* 26 F.3d 36, 39 (6th Cir.1994) require dismissal of Plaintiffs' antitrust claims at the pleading stage if Plaintiffs cannot allege facts showing that Defendants' alleged anticompetitive conduct was a "necessary predicate" to their antitrust injury; i.e., that dismissal is required unless Plaintiffs plead facts showing that the alleged antitrust injury could not possibly have occurred absent Defendants' alleged anticompetitive conduct?

(2) ... In determining whether Plaintiffs' motions for partial judgment were properly granted, whether the Defendants' September 24, 1997 Agreement constitutes a restraint of trade that is illegal *per se* under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under the corresponding state antitrust laws at issue in this litigation.

*Cardizem,* 332 F.3d at 900.

The Sixth Circuit initially addressed the second question and held the agreement was a *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act. The court stated the agreement guaranteeing Andrx money in return for abstaining from marketing their generic and preventing other generics from entering the market through misuse of the 180–day exclusivity period was, "at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the entire United States, a classic example of a *per se* illegal restraint of trade." *Cardizem,* 332 F.3d at 908. The court rejected the defendants' characterization of the

agreement as merely an attempt to enforce patent rights, stating that the payments and the parked 180–day exclusivity arrangement were tantamount to bolstering the patent's effectiveness. Furthermore, the court rejected as irrelevant the defendants' characterizations of the agreement as having procompetitive benefits. Citing *Arizona v. Maricopa County Medical Society,* the court reiterated that the per se rule allows courts to presume certain behaviors are per se anticompetitive without needing to evaluate any proposed procompetitive justifications. *Arizona v. Maricopa Cty. Medical Soc.,* 457 U.S. 332, 351, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). "Thus, the law is clear that once it is decided that a restraint is subject to per se analysis, the claimed lack of any actual anticompetitive effects or presence of procompetitive effects is irrelevant." *Cardizem,* 332 F.3d at 909.

In turning to the question of antitrust injury, the court applied the *Brunswick* test. The *Brunswick* test establishes a two part test to determine antitrust injury. Antitrust injury is (1) "injury of the type that the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

The court found prong one easily fulfilled by the plaintiffs' allegations that as consumers of the drug Cardizem, they were deprived of an alternative, less expensive generic and thus were forced to purchase the higher priced brand name. The court opined that "[p]reventing that kind of injury was undoubtedly a *raison*

*d'etre* of the Sherman Act." *Cardizem,* 332 F.3d at 909 (citations omitted). Yet whether the injury "flows" from that "which makes defendants' acts unlawful" required more discussion.

The defendants, relying on *Hodges v. WSM, Inc.,* 26 F.3d 36, 39 (6th Cir.1994),[11] argued that in order to adequately allege an antitrust injury, a plaintiff must allege that the only way the defendant could have caused the plaintiffs injury was by engaging in the antitrust activity. *Cardizem,* 332 F.3d at 912. As applied to the *Cardizem* case facts, the defendants maintained Andrx *could* have unilaterally and legally decided on its own not to market its generic and thus plaintiffs had not suffered an antitrust injury.

The Sixth Circuit disagreed with this argument and clarified *Hodges,* holding that "in order to survive a motion to dismiss for failure to allege antitrust injury, a plaintiff must allege *either:* (1) that the antitrust violation was 'a necessary predicate' to their injury; or (2) that the defendants could injure plaintiffs only by engaging in the antitrust violation." *Cardizem,* 332 F.3d at 913 (citing *Hodges,* 26 F.3d at 39) (emphasis added by *Cardizem* court). Thus, despite the defendants' allegations of an alternative legal reason for Andrx's decision not to market its generic, the complaint could survive a motion to dismiss because it asserted a viable antitrust injury that flowed from the *per se* illegal agreement. *Id.*

## III.  STANDARD ON MOTION TO DISMISS

A claim survives a motion to dismiss pursuant to Federal Rule of Civil Proce-

11. In *Hodges,* the Sixth Circuit Court affirmed the district court's dismissal for failure to allege an antitrust injury and stated: "[b]ecause plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their antitrust injury or that

defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Hodges,* 26 F.3d at 39 (emphasis added).

dure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir.2002). In doing so, however, plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955; *see also Iqbal*, 129 S.Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir.2007). Particularly in the antitrust context, the Supreme Court cautions that "a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Mich. Division–Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 731–32 (6th Cir.2008) (quoting *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955). The Supreme Court reminded courts that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955 (internal citations omitted). "[A] naked assertion ... gets the complaint close to

stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility...." *Id.* Thus, "something beyond the mere possibility of [relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Id.* (internal citations omitted); *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir.2007) (en banc).

## IV. DISCUSSION

Defendants Sanofi and Apotex seek dismissal of Plaintiffs' Sherman Act Section 1 Claim. Defendants Sanofi and Apotex argue Plaintiffs' Section 1 restraint-of-trade theory is flawed because Plaintiffs fail to allege an antitrust violation and lack standing to bring an antitrust claim for failure to allege an antitrust injury flowing from the alleged anticompetitive behavior.

Defendant Sanofi seeks dismissal of Plaintiffs' Sherman Act Section 2 Claim based on a *Walker Process* theory of monopolization through the "enforcement of a patent procured by fraud" on the PTO. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) ("enforcement of a patent procured by fraud on the Patent Office may be violative of [section] 2 of the Sherman Act provided the other elements necessary to a [section] 2 case are present"). Defendant Sanofi argues Plaintiffs as consumers fail to establish their standing, as *Walker Process* claims are typically permitted by courts only for actual or would-be patent infringers.

Plaintiffs oppose dismissal of any of their claims arguing they pleaded each claim sufficiently to withstand a motion to dismiss.

## A. Section 1 Claims

In their motions to dismiss, Defendants argue Plaintiffs fail to adequately plead a Section 1 claim. Specifically, they assert that Plaintiffs fail to plead a violation of antitrust laws, fail to plead a cognizable antitrust injury, and the attempt to connect their alleged injury to the settlement agreements is hypothetical and speculative.

Plaintiffs assert the agreements are *per se* illegal agreements in violation of antitrust laws and assert an antitrust injury of "overcharges on their purchases of Plavix" flowing from such. Joint Resp. in Opp'n to Mot. to Dismiss (1:06–cv–163, Doc. 74) at 46. Plaintiffs claim that Defendants violated Section 1 of the Sherman Act by entering into unlawful anticompetitive agreements which prevented Defendants from entering into a legal procompetitive agreement. *See* 15 U.S.C. § 1. Plaintiffs allege this legal procompetitive agreement would have resulted in an earlier and sustained entry of generic Plavix into the market place. Plaintiffs allege by entering into these unlawful anticompetitive agreements Defendants sought to restrain trade by keeping generic Plavix out of the market. *Id.*

■ Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. Although Section 1 read literally "prohibits every agreement in restraint of trade", *Maricopa Cty.*, 457 U.S. at 342, 102 S.Ct. 2466, it is well settled that the statute was intended to outlaw only "unreasonable" restraints. *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Thus in order to establish a violation of Section 1 of the Sherman Act, Plaintiffs must allege that Defendants entered into an agreement to unreasonably restrain trade. *Id.; Cardizem*, 332 F.3d at 906.

To establish any antitrust claim, however, a plaintiff must have standing under the antitrust laws. *See NicSand*, 507 F.3d at 450 ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law.").

### 1. Standing

Defendants assert Plaintiffs' complaints fail to establish they have antitrust standing because the complaints fail to assert an antitrust injury that flows from the allegedly anticompetitive agreements. *See, e.g., Valley Prods. Co., Inc. v. Landmark, A Div. of Hospitality Franchise Sys., Inc.*, 128 F.3d 398, 402 (6th Cir.1997) (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690). Specifically, Defendants argue Plaintiffs' alleged injury is not of the type antitrust laws were intended to prevent, does not flow from the alleged violation, and the injury is speculative. Defendants assert the complaints fail to allege an antitrust injury because the agreements on which Plaintiffs hinge their injury never took effect, as evidenced by the fact that the agreements required government approval, never were approved, and Apotex launched at-risk. Instead, Defendants claim Plaintiff's current inability to purchase a generic version of Plavix if it constitutes any type of injury, does not flow from that which supposedly violated the antitrust laws—namely the alleged anticompetitive agreements—but results from the permanent injunction issued after a bench trial in which the court ruled that Sanofi's patent was valid and enforceable. *Sanofi–Synthelabo v. Apotex Inc.*, 492 F.Supp.2d 353 (S.D.N.Y.2007), *aff'd*, 550 F.3d 1075 (Fed.Cir.2008), *cert. denied*, ⸺ U.S. ⸺, 130 S.Ct. 493, 175 L.Ed.2d 346

(2009). As such, Defendants argue Plaintiffs' theory—that in the absence of the actual proposed settlement agreements the Defendants would have reached a "procompetitive agreement" resulting in the sustained presence of generic Plavix on the market—is entirely speculative and conjectural.

Plaintiffs contend they have adequately pleaded an antitrust injury and a valid injury exists and flows from Defendants' agreements. Plaintiffs argue their alleged injury is not speculative. Plaintiffs assert their injury is paying heightened prices for Plavix and this is precisely the type of injury the antitrust laws were designed to prevent.

### (a) Requirements for Antitrust Standing

In the traditional sense, standing is an Article III requirement needing injury-in-fact, a casual connection between the injury and the conduct complained of, and the redressability of that injury by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir.2008). "Yet antitrust standing and Article III standing are not one and the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing." *NicSand*, 507 F.3d at 449.

■ "The Supreme Court has articulated certain factors to be analyzed in determining whether a plaintiff has established antitrust standing." *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir.2000) (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). These factors include:

(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;

(2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;

(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

(4) the potential for duplicative recovery or complex apportionment of damages; and

(5) the existence of more direct victims of the alleged antitrust violation.

*Indeck*, 250 F.3d at 976. The five factors are to be balanced, however, "with no one factor being determinative." *Id.* (citing *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir.1990)).

■ As "antitrust standing is a threshold, pleading-stage inquiry, ... when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *NicSand*, 507 F.3d at 450. As the Sixth Circuit noted in *NicSand*,

[I]t should come as no surprise that, in the seminal antitrust standing case, the Supreme Court dismissed the claim under Rule 12(b)(6). *See Associated Gen. Contractors*, 459 U.S. at 545–46, 103 S.Ct. 897. And our court has dismissed numerous lawsuits for lack of antitrust standing under Rule 12(b)(6). *See Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir.2000); *Valley Prods.*, 128 F.3d at 407; *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 848 (6th Cir.1990); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1351–52 (6th Cir.1989); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir.1989); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th

Cir.1989); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1088 (6th Cir.1983); *see also N.W.S. Mich., Inc. v. Gen. Wine & Liquor Co.*, 58 Fed.Appx. 127, 129–30 (6th Cir.2003); *Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys.*, 198 F.3d 246, 1999 WL 1045098, at *7 (6th Cir.1999); *Dry v. Methodist Med. Ctr. of Oak Ridge, Inc.*, 893 F.2d 1334, 1990 WL 3489, at *5 (6th Cir.1990).

*Id.* As the Supreme Court pointed out, it "is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Assoc. Gen. Contractors of Cal., Inc.*, 459 U.S. at 535, 103 S.Ct. 897 (citation omitted).

### (b) Existence of Antitrust Injury

Antitrust injury is the most hotly disputed element of antitrust standing in this case.

■■ An antitrust claimant must prove antitrust injury, which is to say (1) "injury of the type that the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690; *see also NicSand*, 507 F.3d at 450. A "naked assertion" of antitrust injury is not enough and "an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury." *NicSand*, 507 F.3d at 451 (quoting *Twombly*, 550 U.S. at 553–54, 127 S.Ct. 1955). A claimant must allege more than that an injury is "causally related to an antitrust violation[;]" an injury "will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny...." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (internal citations omitted); *see also NicSand*,

507 F.3d at 451. "The Sixth Circuit ... has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Indeck*, 250 F.3d at 976 (quoting *Valley Prods.*, 128 F.3d at 403.)

■ Defendants rely upon the Sixth Circuit's decisions in the *Axis* trilogy of cases for the proposition that Plaintiffs failed to plead an injury that flows from the alleged violations but instead pleaded an injury that flows from the patent as a valid legal barrier. *Axis*, 870 F.2d at 1105; *Hodges*, 26 F.3d at 36; *Valley Prods. Co.*, 128 F.3d at 398. In *Axis*, the Sixth Circuit found that Axis' alleged injury—lost sales and profits resulting from its exclusion from the U.S. market—did not result from the corporate acquisition the plaintiff challenged on antitrust grounds, but rather from the defendant's patents to which the plaintiff was not licensed. 870 F.2d 1105. For its analysis, the court assumed that the acquisitions violated the antitrust laws. The Sixth Circuit held that even if the defendant's acquisition violated Section 1 of the Sherman Act by reducing competition, the plaintiff did not suffer an antitrust injury because its exclusion from the United States market was not caused by the acquisition, but rather resulted from the enforcement of the patents and the patent controller's refusal to license Axis. Thus even if the violation had not occurred, the plaintiff would have suffered the same injury because the defendant's patents "were an impenetrable barrier" to the plaintiff's entry to the U.S. market. *Id.* The "claims of injury by reason of antitrust violations are compensable only when the injury flows *directly* from the unlawful act." *Id.* at 1109 (emphasis added). Thus, the court held the plaintiff was

not entitled to damages or injunctive relief absent a showing of antitrust injury. Accordingly, the Sixth Circuit affirmed the district court's dismissal.

Similarly, in *Hodges*, the Sixth Circuit held plaintiff's alleged injury, which stemmed from defendant's agreement to refuse certain shuttle services entry to Opryland theme park, was not caused by a violation of antitrust laws, but instead by a legal right to refuse entry onto private property. 26 F.3d at 36. Thus even if the agreement was anticompetitive and in violation of Section 1, *id.* at 38, the court reasoned the illegal antitrust conduct was not the "necessary predicate" of the plaintiff's injury as the defendant exercised a lawful property right to exclude the plaintiff. Accordingly, the Sixth Circuit affirmed the district court's dismissal of the action for failure to state a claim.

And in the final case in this trilogy, *Valley Products*, a case about soap embossed with hotel logos, a manufacturer alleged an antitrust action against a hotel franchiser for terminating the manufacturer's license to produce products and for deciding to choose other manufacturers as its preferred vendors. 128 F.3d 398. The Sixth Circuit held the alleged antitrust violation was not a "necessary predicate" to the plaintiff's injury as the alleged injury would have been suffered whether or not the defendants entered an anticompetitive agreement because of plaintiffs loss of its vendor agreement. Thus, the plaintiff had not suffered an antitrust injury. *Id.* at 404.

The Sixth Circuit further illuminated this line of cases in *Cardizem* when it explained that the *Axis* plaintiffs'

> complaints were dismissed for failure to allege antitrust injury because each of the Defendants had taken an action that it was lawfully entitled to take, independent of the alleged antitrust violation, which was the actual, indisputable, and

sole cause, of the plaintiff's injury. In *Axis*, the antitrust injury was not the "necessary predicate" because the plaintiff's alleged injury—its exclusion from competing in the armature winding machine market—admittedly flowed not from the anticompetitive effects of the allegedly illegal purchase, but from its lack of access to the "impenetrable" patents.

\* \* \*

> Thus, in reality, we have only dismissed a case for failure to allege that an antitrust violation is the "necessary predicate" for the plaintiff's injury where it has been apparent from the face of the complaint that actual and unequivocally legal action by the defendant would have caused plaintiffs injury, even if there had been no antitrust violation.

*Cardizem*, 332 F.3d at 914.

In *Cardizem*, however, the court distinguished the Axis trilogy, finding that the complaint alleged that the *per se* illegal agreement with its payment to the generic manufacturer, rather than the patent, constituted the "necessary predicate" for the generic manufacturer's decision to keep generic product off the market. *Cardizem*, 332 F.3d at 914–15. The *Cardizem* court held that the fact that the generic could have unilaterally, and legally, decided not to bring its generic product to a manifestly profitable market had no relevance in assessing whether the plaintiffs adequately alleged that the antitrust violation was the necessary predicate for their injury. *Id.*

In distinguishing the *Axis* trilogy of cases, the *Cardizem* court clarified that in "none of [the Axis trilogy of] cases was a complaint dismissed for failure to allege antitrust injury based on a defendant's claim that it *could* have caused the same injury without committing the alleged violation." *Cardizem*, 332 F.3d at 914 (em-

phasis in original). Instead, the Cardizem court found that the *Axis* trilogy's complaints were dismissed for failure to allege antitrust injury because each of the "defendants *had taken* an action that it was lawfully entitled to take, independent of the alleged antitrust violation, which was the actual, indisputable, and sole cause of the plaintiffs injury." *Id.* (emphasis added). The *Cardizem* court reasoned that unlike the *Axis'* defendants, the *Cardizem* defendants failed to "identify a lawful right that they had and exercised and that indisputably caused plaintiffs' injury." *Id.* at 914–15.

Plaintiffs would have the Court find this case analogous to *Cardizem.* The Court, however, finds the instant case analogous to the Axis trilogy of cases because Plaintiffs' allegations, taken as true and construed in their favor, preclude the possibility that their injury flowed from the anticompetitive effects of the agreements "which make [D]efendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690. While the instant case is somewhat factually similar to *Cardizem* in that it involves a reverse payment agreement, in *Cardizem,* the agreements and reverse payments kept the generic from entering the market. Not so in this case. The complaints establish Apotex's launch at-risk flooded the clopidogrel bisulfate market with generic product and the dissemination of this generic drug was stopped by the preliminary and permanent injunctions obtained by Sanofi against Apotex. The complaints themselves state that the alleged anticompetitive agreements neither precluded Apotex from selling clopidogrel bisulfate nor prevented these Plaintiffs from buying it. The complaints claim that the injunction stopped Apotex from putting anymore generic Plavix on the market.

Defendants identify a lawful right that they had and exercised—litigation of the '265 patent to determine its validity resulting in a preliminary and permanent injunction—independent of the alleged antitrust violation, which was the "actual, indisputable, and sole cause of Plaintiffs' injury." *Id.* (emphasis added). Had the New York district court not issued the injunctions, Plaintiffs would still have access to generic clopidogrel bisulfate and would have no injury. Thus, Plaintiffs' injury of being "overcharge[d] on their purchases of Piavix" resulted when the generic was pulled from the market as a result of the injunction, notwithstanding the allegedly anticompetitive agreements. The injunctions barring infringement of the '265 patent and the '265 patent itself are impenetrable legal impediments to the sale of generic Piavix, resulting in Plaintiffs' inability to "purchase Piavix and its generic equivalents for a sustained and continuous period of time." Direct. Puch. Compl. ¶ 162(b). Such alleged "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury,' " *Atl. Richfield,* 495 U.S. at 333, 110 S.Ct. 1884 (citations omitted), since it "flows directly from conduct that is not itself an antitrust violation." *See Indeck,* 250 F.3d at 976.

Since antitrust injury is a necessary component of antitrust standing, dismissal is appropriate.

### (c) Injury is Speculative

As addressed above, the Supreme Court instructs in *Twombly* that a naked assertion of antitrust injury is not enough and an antitrust claimant must put forth factual allegations plausibly suggesting (not merely consistent with) antitrust injury. *Twombly,* 550 U.S. at 555–56, 127 S.Ct. 1955.

Defendants argue Plaintiffs' "but for" theory attempts to fill in missing links between the alleged anticompetitive agreements and the injury of being "overcharge[d] on their purchases of Plavix"

and that such missing links are fatal to Plaintiffs' case. Defendants state that Plaintiffs' theory that but for the alleged anticompetitive March and May agreements, Defendants would have reached a procompetitive agreement allowing early entry of the generic onto the market obviating the need for a patent trial is pure speculation. Defendants argue conjectural and hypothetical injuries such as this are insufficient to establish the injury-in-fact required to establish the constitutional minimum for standing.

Plaintiffs contend the Court must accept as true the allegation that "were it not for the unlawful agreements, ... given the pressure and incentive to settle faced by all of the Defendants, the Defendants would have reached a procompetitive agreement." Joint Resp. in Opp'n to Mot. to Dismiss (Case No. 1:06–cv–163, Doc. 74) at 47. Plaintiffs allege the illegal agreements prevented Defendants from entering into a different agreement which Plaintiffs aver would have been more procompetitive than the negotiated agreements. Plaintiffs argue the lack of agreement compelled the generic to enter the market, forcing the subsequent injunction, and instigating the eventual finding of the validity of the challenged patent. Plaintiffs argue that the anticompetitive agreements injured them by preventing a true, procompetitive agreement from being reached between Sanofi and Apotex. Plaintiffs state this procompetitive agreement would have allowed the entry of generic clopidigrel bisulfate "well before 2011 [the patent's expiration] ... at a price materially below the branded version." Third Consol. Am. Compl. (Case No. 1:06–cv–202, Doc. 92) at ¶ 136. Plaintiffs claim the procompetitive agreement would have "permitted Apotex to enter the market immediately ... in return for royalty payments from Apotex reflecting the parties' contemporaneous valuation of Sanofi's patent rights," or it would have permitted "early-entry settlement in which Sanofi would have given up some portion of its patent life in exchange for Apotex agreeing to delay its entry for some period of time...." Id. at ¶ 137.

In Associated General Contractors, 459 U.S. at 519, 103 S.Ct. 897, the Supreme Court dismissed a Section 1 claim for lack of standing where the claimant's injury and the alleged restraint in the market contained several "somewhat vaguely defined links" and was "highly speculative." The "tenuous and speculative character of the relationship between the alleged antitrust violation" and the injury claim weighed "heavily against judicial enforcement of the [claimant's] antitrust claim." Id. at 542–43, 545–46, 103 S.Ct. 897. "The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits." Id. at 542–44, 103 S.Ct. 897. See also Lujan, 504 U.S. at 560–61, 112 S.Ct. 2130 (finding that the constitutional minimum for general standing consists of (1) an injury-in-fact which is concrete and particularized, and actual or imminent not conjectural or hypothetical, (2) a casual connection between the injury and the conduct complained of, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision (internal citations omitted)); Whitmore v. Arkansas, 495 U.S. 149, 156, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (A complainant must allege an injury to himself that is distinct and palpable not merely abstract and the alleged harm must be actual and imminent not hypothetical); Warth v. Seldin, 422 U.S. 490, 507, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (the plaintiffs denied standing where they "rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted

otherwise, and might improve were the court to afford relief"); *Coyne v. Am. Tobacco*, 183 F.3d 488, 494 (6th Cir.1999) ("To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury.").

Defendants argue Plaintiffs cannot satisfy standing requirements by merely asserting that but for a challenged action, Defendants would have proceeded in a way that benefitted Plaintiffs. Defendants rely on *American Federation of Government Employees v. Clinton*, 180 F.3d 727 (6th Cir.1999), cert. denied, 529 U.S. 1018, 120 S.Ct. 1417, 146 L.Ed.2d 310 (2000). In that case, the plaintiffs challenged an administrative determination which allowed only private contractors to bid on work at Air Force bases. The plaintiffs alleged that if work at the Air Force bases were bid on by other military bases and not just private contractors, those other military bases would have won the bids and plaintiffs would have better employment opportunities. *Id.* The Sixth Circuit affirmed the district court's dismissal of plaintiffs' claims for lack of standing, finding the asserted "injuries too speculative, and insufficiently concrete and particularized, to establish Article III standing." *Id.* at 731. The court indicated the injuries alleged tended to "involve a potential loss of job benefits, not an actual one .... [and] any benefit loss results most clearly from the unchallengeable and unchallenged decision to close bases", not the decision to limit bidding to private contractors. *Id.* at 732.

The Court finds *American Federation* analogous to the current Plaintiffs' "but for" world. Although a plaintiff "need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be provided as a matter of fact and with a fair degree of certainty." *Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir.2001) (citations omitted). Here, the causal link is strewn far: but for the alleged anticompetitive agreements, Sanofi not only would have entered into a different settlement agreement with Apotex but one with more procompetitive terms than the March and May agreements actually negotiated between Sanofi and Apotex which allowed early entry of Apotex's generic onto the market; the hypothetical agreement would receive regulatory clearance; and such events would have prevented the preliminary injunction, prevented the determination of the validity of the patent by the patent court, and prevented the permanent injunction which prevented Apotex from selling generic Plavix before the expiration of the patent.

In order to connect the alleged injury—lack of access to generic Plavix—to the anticompetitive agreements, and to circumvent the launch at-risk and subsequent injunctions, Plaintiffs weave a circuitous "but for" scenario which would have resulted in sustained early entrance of generic Plavix thus preventing their alleged injury. This indirect causal link between Defendants' alleged wrongful actions—the March and May anticompetitive agreement—and Plaintiffs' injuries is not a matter of fact [12] and rests on a purely hypothetical early-entrance agreement that would provide Plaintiffs the benefit of earlier access to generic Plavix. Plaintiffs

---

12. *See, e.g.,* Merriam–Webster Online Dictionary, 2009 (defining fact as "a thing done"; "the quality of being actual"; "something that has actual existence"; or "an actual occurrence").

cannot satisfy standing requirements by merely asserting that but for a challenged action, Defendants would have proceeded in a way that benefitted Plaintiffs. *See Warth*, 422 U.S. at 507, 95 S.Ct. 2197. The Court finds the claim for an injury deriving from the failure to reach a hypothetical procompetitive agreement is "nothing but speculation." *Assoc. Gen. Contractors*, 459 U.S. at 542–43, 545–46, 103 S.Ct. 897; *Indeck*, 250 F.3d at 977 (affirming the district court's dismissal of the Section 1 claim because the claimed injury and the antitrust damages alleged by plaintiff from defendant's acts were, among other things, too indirect and speculative).

Furthermore, the difficulty in determining damages for speculative claims supports a finding that such claims cannot meet the requirements of antitrust standing. *Assoc. Gen. Contractors*, 459 U.S. at 542–44, 103 S.Ct. 897 ("Partly because [the injury] is indirect, and partly because the alleged effects on the [claimant] may have been produced by independent factors, the [claimant]'s damages claim is also highly speculative"). In remarking on the difficulty of ascertaining damages of such a speculative injury, the Supreme Court noted that "any attempt to ascertain damages with such precision 'would often require additional long and complicated proceedings involving massive evidence and complicated theories.'" *Id.* at 544, 103 S.Ct. 897 (citations omitted).

The Court notes that if the injury began to accrue at the time the agreements were made, or at the time an alternative procompetitive agreement would have been reached, the alleged injury would still be occurring notwithstanding Sanofi's valid patent and the permanent injunction preventing entry of Apotex's generic onto the market. Essentially, the injury would only end when the patent expired and Plaintiffs gained access to the generic Pla-

vix. It seems illogical to suggest that a patent-holder must pay consumers for being injured by not having access to a generic when the patent holder possesses a valid patent preventing entrance of such a generic onto the market. The relief requested by Plaintiffs would not redress or prevent Plaintiffs' alleged injury. Furthermore the damages theory relies on speculation as to what might have been negotiated in a hypothetical agreement and such damages would be impossible to define. Such difficulty in ascertaining damages of such a speculative injury is outside Congress's intent for enacting the Sherman Act. *See Axis*, 870 F.2d at 1107 (citing *Hawaii v. Standard Oil*, 405 U.S. 251, 263, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation")).

Instead, reading the complaint in the light most favorable to Plaintiffs, the injuries alleged tend to involve a loss of potential access to generic Plavix if a hypothetical procompetitive agreement were reached, not an actual one, and any benefit lost results from the preliminary and permanent injunctions. *Id.* at 731. Plaintiffs' complaint hinges on a purely conjectural theory of antitrust injury. The Court finds such injury is speculative and insufficiently concrete and particularized to establish standing.

Plaintiffs, however, rely on the New Jersey district court decision in *In re K–Dur* for their "but for" proposition. *In re K–Dur*, 338 F.Supp.2d 517 (D.N.J.2004). In *K–Dur*, the state of Pennsylvania and various direct and indirect purchasers of K–Dur, a pioneer potassium chloride supplement used to treat patients with depleted potassium levels, sued the manufacturer and generic manufacturers alleging the defendants entered into an unlawful agree-

ment in restraint of trade in violation of Sections 1 and 2 of the Sherman Act. The district court found that "a reasonable trier of fact could conclude that but for the allegedly anti-competitive agreements, generic drugs may have entered the market sooner." *Id.* at 532, 535. Accordingly, the district court found the plaintiffs pleaded "sufficiently the anti-competitive behavior (an agreement in restraint of trade) and injury (higher prices) required to state a Sherman Act violation." *Id.*

The Court is unpersuaded by the reasoning in *K–Dur. K–Dur* is distinguishable because, that case, like *Cardizem,* involved actual reverse payments. Neither involved a generic manufacturer prevented by injunctions from continuing to provide generic product to the market. Here, in contrast, the Court has already held that these Plaintiffs have neither pled a cognizable injury nor a direct relation between Plaintiffs' alleged injury and Defendants' alleged misconduct. In this case, the "but for" theory is an attempt by Plaintiff to circumvent the reality of the permanent injunction that removed the generic from the market and produced the level of competition—or more aptly lack of competition—as it currently exists. Lastly, *K–Dur* was decided under the older Conley-standard which was heightened by the Supreme Court's rulings in *Twombly* and *Iqbal.*

In this case, Plaintiffs do not allege their injury—lack of access to generic Plavix—derives directly from the alleged anticompetitive agreements. On the face of the complaint, Plaintiffs assert their injury hinges on the *failure* to enter a hypothetical agreement. In an attempt to skirt the injunctions as the source of its injury, Plaintiffs allege a speculative link of acrimony that flowed from the anticompetitive agreements which in turn prevented entrance into a procompetitive agreement. Plaintiffs cloud the issue through discus-

sion of Sanofi's criminal sanctions in support of the alleged "acrimony."

Plaintiffs' complaints state the agreements were *per se* illegal, but the alleged competition-destroying conduct did not destroy competition, as evidenced by Plaintiffs' allegations that Apotex went to market notwithstanding the agreement. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"). Indeed, Plaintiffs cannot satisfy their pleading burden by ignoring the course of action that did occur—i.e. a launch at-risk followed by an injunction and a subsequent trial—and in a conclusory fashion asserting Defendants would have procompetitively settled instead of proceeding to trial. Plaintiffs' asserted "but for" scenario presupposing arrangements is not fact and the Court will not accept unwarranted inferences of fact cast in the form of factual allegations. *See Blackburn v. Fisk Univ.,* 443 F.2d 121, 124 (6th Cir.1971); *see also Twombly,* 550 U.S. at 555–56, 127 S.Ct. 1955.

Plaintiffs point to an FTC study and law review articles saying many similar type disputes are settled, however, conduct of others does not bespeak conduct by these Defendants. *See* Joint Resp. in Opp'n to Defs.' Mot. to Dismiss (Case No. 1:06–cv–163, Doc. 74) at 59–60 and Ex. E. An allegation of anticompetitive agreements and a naked assertion of the mere possibility of injury tied to these agreements is not adequate. Conclusory allegations will not suffice, absent "further factual enhancement," to propel Plaintiffs' complaints across the "line between possibility and plausibility of entitlement to relief." *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955. Instead the complaints make a series of speculative links of what could, would, or

should have happened that would allow Plaintiffs to currently have access to a generic version of the patented Plavix drug. The antitrust laws are not designed to ensure the most productive competition or the most procompetitive agreement that could be reached, they are designed to ensure a market free from inappropriate restraints on competition. And the Supreme Court requires more than "naked assertion[s]" of antitrust injury to establish antitrust standing. *See NicSand*, 507 F.3d at 451 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

### (d) Conclusion

The Court finds Plaintiffs lack antitrust standing to bring a Section 1 claim against Defendants because Plaintiffs fail to demonstrate that the alleged antitrust violation was a necessary predicate of Plaintiffs' injury and the asserted injury is speculative. In balancing these factors,

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
>
> (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
>
> (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

*Indeck*, 250 F.3d at 976, each factor supports dismissal of Plaintiffs' Section 1 claim for failing to allege an antitrust injury that flows from the pleaded anticompetitive behavior.

### 2. Violation of Antitrust Laws / *Per se* Violation of Antitrust Laws

Although the parties dispute whether Plaintiffs have adequately alleged a violation of the antitrust laws, the Court need not reach this argument as Plaintiffs' failure to allege an antitrust injury and their lack of antitrust standing disposes of Plaintiffs' Section 1 claim. A conclusion that the March or May Agreement was a "*per se* illegal restraint of trade does not obviate the need to decide whether the plaintiffs adequately alleged antitrust injury." *Cardizem*, 332 F.3d at FN. 15 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–42, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury. . . .")).

Accordingly, since antitrust injury was insufficiently pleaded, the Court declines to analyze whether Plaintiffs adequately pleaded that the March and May settlement agreements violated the antitrust laws.

### B. Section 2 Claims

Defendant Sanofi argues it is entitled to have the Sherman Act Section 2 claims, 15 U.S.C. § 2, against it dismissed because Plaintiffs lack standing to pursue the Section 2 claims. Specifically, Sanofi asserts that Plaintiffs' *Walker Process* claims, claims based on a fraudulently obtained patent, must fail as Plaintiffs cannot challenge the patent directly and therefore should not be able to challenge the patent's validity under *Walker Process*. *Walker Process*, 382 U.S. at 174, 177, 86 S.Ct. 347 ("enforcement of a patent procured by fraud on the Patent Office may be violative of [Section] 2 of the Sherman Act."). Sanofi argues that the *Walker Process* decision did not contemplate direct consumers as suitable plaintiffs in this type of action. Rather, it contends, the only entity with standing to bring a *Walker Process* claim is an entity against whom a fraudulently obtained patent is, or could be, enforced.

Plaintiffs maintain that Sanofi unlawfully monopolized the clopidogrel bisulfate

market by enforcing the '265 patent, a patent procured by fraud, in violation of Section 2 of the Sherman Act. Specifically, Plaintiffs allege Sanofi violated Section 2 of the Sherman Act by committing fraud on the PTO, listing the fraudulently obtained patent in the FDA's Orange Book, filing and prosecuting patent infringement actions against Apotex and other prospective generic competitors, and entering into the illegal agreements with Apotex described above. Because Plaintiffs are direct purchasers of Plavix, Plaintiffs assert that they have standing to prosecute a *Walker Process* claim as an injured party under the antitrust laws.

■ Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ... shall be deemed guilty of a felony ..." 15 U.S.C. § 2. To establish a Section 2 violation, plaintiffs must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 622 (6th Cir.1999).

### 1. *Walker Process* Claim

*Walker Process* claims are based on a fraudulently obtained patent. In *Walker Process,* the Supreme Court held that although a "patent ... is an exception to the general rule against monopolies and to the right to access a free and open market"

and is generally immune from a suit for antitrust liability, the "enforcement of a patent procured by fraud on the Patent Office may be violative of [Section] 2 of the Sherman Act." *Walker Process,* 382 U.S. at 174, 177, 86 S.Ct. 347. Typically, *Walker Process* claims are brought as counterclaims in patent infringement lawsuits; for instance, a plaintiff claims the defendant is infringing his patent and the defendant counterclaims that the patent was obtained fraudulently and is invalid. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1067 (Fed.Cir.1998) ("an antitrust claim premised on stripping a patentee of its immunity from the antitrust laws is typically raised as a counterclaim by a defendant in a patent infringement suit"); *see also In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 689–90 (2d Cir.2009) ("*Walker Process* claims are based on a fraudulently obtained patent, and are typically brought as counterclaims in patent infringement suits: the plaintiff claims the defendant infringed his patent, and the defendant responds that the patent was invalid as fraudulently obtained, and that the plaintiff's enforcement efforts violate *Walker Process.*").

■ Outside the context of an infringement suit counterclaim, a patent's validity can be challenged only by a party (1) producing or preparing to produce the patented product, and (2) being threatened or reasonably likely to be threatened with an infringement suit. *In re DDAVP,* 585 F.3d at 690 (citing *Cordis Corp. v. Medtronic, Inc.,* 835 F.2d 859, 862 (Fed.Cir. 1987)). As purchasers of Plavix, the plaintiffs do not satisfy these requirements and cannot directly challenge the '265 patent's validity.

■ Whether a direct purchaser that cannot directly challenge a patent's validity can instead allege a *Walker Process* claim or if such *Walker Process* claim is

available only to actual or would-be infringers is not as clear, as cases litigating the issue show. For example, Sanofi points to *In re Remeron Antitrust Litigation*, 335 F.Supp.2d 522 (D.N.J.2004), among others, for the proposition that district courts have dismissed *Walker Process* claims brought by direct purchasers, finding that direct purchasers lack standing to pursue *Walker Process* claims challenging a patent. In *In re Remeron*, the district court dismissed the *Walker Process* claim brought by the direct purchasers of mirtazapine against the drug's manufacturer. The district court reasoned that *"Walker Process* and its progeny involve antitrust counterclaimants who were potential or actual competitors in patent infringement suits." *Id.* at 529. As the direct purchasers "neither produced mirtazapine nor would have done so ... [and] Plaintiffs were not party to the initial patent infringement suits," the court concluded the direct purchasers lacked standing to pursue a *Walker Process* claim. *Id. See also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F.Supp.2d 514 (E.D.N.Y. 2005) (recognizing a "serious question [as to] whether indirect plaintiffs have standing to assert a *Walker Process* claim"); *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (J. Posner sitting by designation) (the fraud at issue in a *Walker Process* claim is directed at a patentee's competitors and therefore suppliers of inactive pharmaceutical ingredients for those competitors lacked standing). *Cf. Associated Gen. Contractors of Cal.*, 459 U.S. 519, 103 S.Ct. 897 (not every and any party connected with an antitrust violation has standing to bring an antitrust claim).

Conversely, Plaintiffs point the Court to *Molecular Diagnostics Labs. v. Hoffmann–La Roche Inc.*, 402 F.Supp.2d 276 (D.D.C.2005). In *Molecular Diagnostics*, the district court specifically disagreed with the *In re Remeron court*, and instead found that direct purchasers have standing under *Walker Process* despite the direct purchasers lack of status as a competitor or party to an infringement suit. *Id.* The court reasoned that because the harm in a *Walker Process* claim is the antitrust violation through the fraudulently procured patent, and not the fraud itself, a direct purchaser who can meet the traditional antitrust standing requirements satisfies standing in a *Walker Process* claim. Accordingly, the *Molecular Diagnostics* district court proceeded to analyze the direct purchasers' standing under the "standing requirements in more conventional antitrust actions." *Id.* at 281. *See also In re Netflix Antitrust Litig.*, 506 F.Supp.2d 308, 316 (N.D.Cal.2007) (finding *Molecular Diagnostics* persuasive for the proposition that "even though *Walker Process* claims are predicated on enforcement of a fraudulently-obtained patent, the harm still accrues directly to consumers").

Further convoluting standing in a *Walker Process* context is a recent decision from the Second Circuit, *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677 (2d Cir.2009). In *In re DDAVP*, the Second Circuit reversed the district court's ruling that direct purchasers lack standing to pursue *Walker Process* claims against a drug manufacturer. *Id.* The district court relied primarily on *In re Remeron* and *In re Ciprofloxacin*. *Id.* In addressing "a question of first impression" of "whether the plaintiffs have standing to bring their *Walker Process* claim, when a court has yet to find [a] patent fraudulently obtained," the Second Circuit fashioned a narrow ruling. Based on the fact the purchaser plaintiffs were challenging an "already tarnished patent," the Second Circuit stated "[w]e therefore hold only that purchaser plaintiffs have standing to raise *Walker Process* claims for patents that are already unenforceable due to inequitable conduct." *Id.* at 690–91 (emphasis

added). The Second Circuit specifically declined to decide "whether purchaser plaintiffs per se have standing to raise *Walker Process* claims." *Id.* at 691–92. Notably, the Second Circuit addressed that "[i]f a patent is valid, a *Walker Process* claim cannot stand." *Id.* at 690. In styling their limited ruling, the court recognized the defendants' argument that:

> giving *Walker Process* standing to the plaintiffs, who cannot directly challenge the '398 patent's validity, could result in an avalanche of patent challenges, because direct purchasers otherwise unable to challenge a patent's validity could do so simply by dressing their patent challenge with a *Walker Process* claim. It would be relatively easy, the defendants argue, for these purchasers to allege an antitrust injury, as patent protection inherently leads to supracompetitive prices.... Given that *Walker Process* fraud converts this fundamental feature of the patent system into a potential antitrust violation, the defendants contend that finding purchaser standing could significantly increase the costs of defending and enforcing patents by greatly expanding the universe of potential challenges.

*Id.* at 690. The court balanced the defendants' argument against its concern that antitrust violations would go unremedied if

> direct purchasers would be able to recover antitrust damages from a fraudulent patentee only after that patentee first loses on a fraudulent procurement claim. This asks too much of the generic competitors and other potential patent challengers, who may not have the strategic interest or the resources to start or win such a battle, or who may be presented with strong incentives to settle their challenge by patent holders seeking not only to preserve their patent's enforceability, but also to avoid potential *Walker Process* liability.

*Id.* at 691. Accordingly, as to "not pass lightly over the defendants' objections to expanding the universe of patent challengers [and without] disturbing the incentives for innovation," the Second Circuit "tread carefully" by holding "only that purchaser plaintiffs have standing to raise *Walker Process* claims for patents that are already unenforceable due to inequitable conduct." *Id.* at 691–92.

None of the above discussed cases are binding precedent on this Court, however, each is persuasive. In comparing the case *sub judice* and taking all the facts in a light most favorable to Plaintiffs, the Court finds the reasoning of *In re Remeron* and *In re Ciprofloxacin* more persuasive than the holding of *Molecular Diagnostics*. Significantly, the balance of the courts interpreting standing of consumers in *Walker Process* claims deny such parties standing.

Sanofi points out, and the Court agrees, that there is "no case in which a federal court has concluded that purchasers of a patented product have standing to assert a *Walker Process* claim against a patent holder where the underlying patent has been upheld as valid and enforced against an infringer." Def. Sanofi's Memo. in Supp. of Mot. to Dismiss (Case No. 2:06–cv–163, Doc. 68–2) at 38. In such circumstance, the infringer itself, in this case Apotex, would be unable to substantiate a *Walker Process* claim. *E.g., Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.,* 384 F.Supp.2d 1334, 1353 (S.D.Iowa 2005) (finding of patent validity necessitates dismissal of defendant's *Walker Process* counterclaim as unsupportable as a matter of law because it is premised on a finding that the patents-in-suit are invalid and unenforceable).

In this case, Apotex litigated the validity and enforceability of the '265 patent through the Federal Circuit; the Federal

Circuit affirmed the district court's ruling that Sanofi's '265 patent was valid and enforceable. *See Sanofi–Synthelabo v. Apotex Inc.,* 492 F.Supp.2d 353, 397 (S.D.N.Y.2007), *aff'd,* 550 F.3d 1075 (Fed. Cir.2008), *cert denied,* —— U.S. ——, 130 S.Ct. 493, 175 L.Ed.2d 346 (2009). Apotex failed to establish by clear and convincing evidence that Sanofi engaged in inequitable conduct when prosecuting the drug patent before the PTO. *id.* Those counterclaims by Apotex are almost identical to the claims brought in this case by the direct purchasers. Subsequent to the Federal Circuit's ruling upholding the validity and enforceability of the '265 patent, the other cases brought by Sanofi against potential generic manufacturers Dr. Reddy's and Teva resulted in a stipulated judgment of the parties that the '265 patent was valid and enforceable. *See* Consent J. and Order at 1–2, *Sanofi–Synthelabo v. Dr. Reddy's Labs,* Case No. 1:02–cv–03672 (S.D.N.Y June 30, 2009) (J. Stein); Stipulation of Order of Dismissal, *Sanofi–Aventis v. Teva Pharmaceuticals USA, Inc.,* Case No. 1:04–cv–07548 (S.D.N.Y. Jan. 15, 2005) (J. Stein).

Given the facts of this case, the Court declines Plaintiffs' invitation to stray beyond the realm of *Walker Process* cases denying direct purchasers standing. *In re Remeron,* 335 F.Supp.2d at 522; *In re Ciprofloxacin,* 363 F.Supp.2d at 514. Persuasively, the policy concerns noted by the Second Circuit for its narrow holding, such as fear a claim would go unlitigated by an alleged infringer, do not exist in this case. As eloquently stated in *In re Ciprofloxacin:*

> Given that consumers are often subjected to monopoly prices for invalid patents, it is tempting to suggest that, as a policy matter, a rule should be fashioned giving consumers of drugs—and perhaps patented goods generally—the right to challenge the validity of patents.... Under the proposed rule, the consumers

would have to show by clear and convincing evidence—as accused infringers must—that the subject patent was invalid. This proposal would have the effect of allowing non-infringing consumers of a patented product to seek to invalidate the patent in order to allow price-reducing competitors to enter the market. The desirability of such a change is a complex issue which ... should be made by Congress, and not by the courts.

*In re Ciprofloxacin,* 363 F.Supp.2d at 542.

The Court is loathe to grant such an expansion of potential patent challengers by conferring standing to direct purchasers of a drug for which the patent has been judicially determined to be valid and enforceable. *Cf. In re DDAVP,* 585 F.3d at 690 ("If a patent is valid, a *Walker Process* claim cannot stand."). While the Court recognizes Plaintiffs were not parties to the original challenge to the '265 patent, the Court in this case does not find reason to disrupt the delicate balance between patent law and antitrust law that *Walker Process* delineated. The Second Circuit's decision specifically crafted a narrow holding so to not disturb this balance, and such narrowing is telling of the Second Circuit's hesitation to expand standing in *Walker Process* cases to all direct purchasers. *Id.* at 691–92 (Second Circuit specifically declined to decide "whether purchaser plaintiffs per se have standing to raise *Walker Process* claims."). This Court too will tread carefully so as not to open the door to all direct purchasers otherwise unable to challenge a patent's validity being able to do so by dressing their patent challenge with a *Walker Process* claim. Accordingly, the Court finds Plaintiffs lack standing to pursue their *Walker Process* claims.

### 2. Other Section 2 claims

In addition to its *Walker Process* claim, Plaintiffs assert Defendants violated Sec-

tion 2 by "enforcing the fraudulently procured '265 patent by submitting it to the FDA for listing in the FDA's Orange Book and by filing and prosecuting patent infringement actions against Apotex and other prospective generic competitors." Second Am. Compl. (Case No. 1:06–cv–163, Doc. 62) at ¶ 135. Plaintiffs argue that Sanofi conducted sham litigation by the filing of the infringement actions against Apotex, Teva, and other prospective generic competitors, and by listing the patent in the Orange Book of patents which Plaintiffs argue was done for delay.

"[Under *Professional Real Estate Investors, Inc. v. Columbia Pictures* ] a sham suit must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless. Accordingly, if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial. *Id.* In contrast with a Walker Process claim, a patentee's activities in procuring the patent are not necessarily at issue. It is the bringing of the lawsuit that is subjectively and objectively baseless that must be proved."

*Nobelpharma,* 141 F.3d at 1072 (citing *Prof'l Real Estate Investors v. Columbia Pictures,* 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)).

■■■ "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized [from antitrust liability], and an antitrust claim premised on the sham exception must fail." *Prof'l Real Estate Investors,* 508 U.S. at 60, 113 S.Ct. 1920. The Supreme Court then noted that a "winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 60 n. 5, 113 S.Ct. 1920.

In construing the complaints in the light most favorable to the Plaintiffs, it does not follow that Sanofi's lawsuit against Apotex was subjectively and objectively baseless. Sanofi successfully won the lawsuit and thus exerted reasonable effort to petition for redress. *Prof'l Real Estate Investors,* 508 U.S. at 60 n. 5, 113 S.Ct. 1920. Likewise, it follows that Sanofi's listing of the '265 patent in the Orange Book was not in bad faith, merely a standard action under the Hatch–Waxman Act.

In regard to the argument by Plaintiffs that Defendants conspired to restrain trade through the March and May agreements, this argument fails for the reasons stated above for failure to plead an antitrust injury that flows from that which makes Defendants' acts unlawful.

### 3. Conclusion

The Court finds Plaintiffs lack standing to pursue their *Walker Process* claim. The Court also finds Plaintiffs fail to state a Section 2 claim for submission of the '265 patent for listing in the FDA's Orange Book and for filing and prosecuting patent infringement actions against Apotex and other prospective generic competitors.

## V. DISPOSITION

The Court finds Plaintiffs lack antitrust standing to bring a Section 1 claim against Defendants as Plaintiffs fail to allege that the asserted antitrust violation was a necessary predicate of Plaintiffs' injury and any injury alleged is speculative. The Court further finds that Direct Purchaser Plaintiffs do not have standing to bring Section 2 *Walker Process* claims against Sanofi.

Accordingly, the Court **GRANTS** Defendants' Motions to Dismiss (Case No. 1:06–CV–163, Docs. 67 & 68; Case No. 1:06–CV–202, Docs. 97 & 98; Case No. 1:06–CV–427, Docs. 60 & 61). The Clerk of Court is **DIRECTED** to enter final judgment with prejudice against Plaintiffs in

the following cases and to close these cases: Case Nos. 1:06–CV–163, 1:06–CV–202, and 1:06–CV–427. The Clerk of Court is **DIRECTED** to enter final judgment with prejudice against the plaintiffs in the following consolidated cases and to close these cases: Case Nos. 1:06–cv–224; 1:06–cv–518; 1:06–cv–533; 1:06–cv–545; and 1:06–cv–550. The Clerk is further instructed to remove all the aforementioned cases from this Court's Civil Justice Reform Act Report.

**IT IS SO ORDERED.**